IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| V.L.H., | : |
|         **Plaintiff,** | : |
|         v. | :   Case No. 5:22-cv-00155-CHW |
| **COMMISSIONER OF SOCIAL SECURITY,** | :   Social Security Appeal |
|         **Defendant.** | : |

**ORDER**

This is a review of a final decision of the Commissioner of Social Security denying Plaintiff V.L.H.'s application for disability benefits. The parties consented to have a United States Magistrate Judge conduct all proceedings in this case, and as a result, any appeal from this judgment may be taken directly to the Eleventh Circuit Court of Appeals in the same manner as an appeal from any other judgment of the United States District Court. Because the ALJ correctly applied the pain standard to Plaintiff's case and substantial evidence supports the Commissioner's decision, Plaintiff's case is **AFFIRMED**.

**BACKGROUND**

Plaintiff applied for Title II disability benefits on January 11, 2019, alleging disability beginning on November 13, 2018, based on having high blood pressure, thyroid issues, and both hips replaced. (R. 75-76). Her date last insured (DLI) was September 30, 2020. (R. 75). After Plaintiff's applications were denied initially and on reconsideration at the state agency level of review (Exs. 1A, 3A), Plaintiff requested further review before an administrative law judge (ALJ). The reviewing ALJ held a telephonic hearing on May 20, 2021. (R. 36-74). The ALJ issued an

1

unfavorable opinion on July 19, 2021. (R. 12-35). Plaintiff's request for review of that decision by the Appeals Council was denied on March 14, 2022. (R. 1-6). The case is now ripe for judicial review. *See* 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

Judicial review of a decision of the Commissioner of Social Security is limited to a determination of whether that decision is supported by substantial evidence, as well as whether the Commissioner applied the correct legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "Substantial evidence" is defined as "more than a scintilla," and as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Eleventh Circuit has explained that reviewing courts may not decide the facts anew, reweigh the evidence, or substitute their judgment for that of the Commissioner. *Id.* Rather, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if the evidence preponderates against it.

## EVALUATION OF DISABILITY

Social Security claimants are "disabled" if they are unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). To be eligible for benefits, Plaintiff's disability must be established prior to her date last insured. *See id.*

The Social Security Regulations outline a five-step sequential evaluation process for determining whether a claimant is disabled: "(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments

in the Listing of impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience." *Winschel*, 631 F.3d at 1178 (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v); 416.920(a)(4)(i)-(v)).

## MEDICAL RECORD

Plaintiff primarily treated with Dr. David Wiley at Middle Georgia Orthopaedic Surgery and Sports Medicine for issues related to her hips. (Exs. 1F, 2F, 11F, 12F, 16F, 19F). Plaintiff was first referred to Dr. Wiley for issues with her right hip in February 2017. (R. 379-382, 384-387). Plaintiff underwent a total right hip replacement in March 2017, and her post-operative appointments showed that she was healing well. (R. 362-378). Plaintiff returned to Dr. Wiley several times between November 2017 and October 2018, complaining of left hip pain, which had caused her to miss some days from work. (R. 301, 304, 307, 310, 313, 316, 319). Plaintiff described the pain as "dull, sharp, throbbing, aching, pressure, and radiating." (*Id.*) These visits' notes reflect that Plaintiff's had no complaints about her right hip. (*Id.*) X-rays showed the right hip replacement's components remained in good position but also showed severe degenerative changes in her left hip. (R. 303, 305, 308, 311, 314, 317, 321). Dr. Wiley noted that Plaintiff had several comorbidities, including diverticulitis, hypertension, right knee osteoarthritis, and thyroid disease. *See e.g.*, (R. 309). At the November 2017 and June 2018 appointments, Plaintiff received steroid injections in her left hip (R. 309), but following the September and October 2018 appointments, Dr. Wiley scheduled Plaintiff for a left total hip arthroplasty. (R. 303, 306).

Plaintiff underwent a left hip replacement on November 14, 2018. *See, e.g.*, (R. 295). Imaging completed contemporaneous to surgery showed satisfactory alignment of the new hip. (R.

293). Three weeks after the surgery, Plaintiff's incision was healing well, and Plaintiff's at-home physical therapy was going well. (R. 299). Plaintiff returned to Dr. Wiley seven weeks after surgery. (R. 297-298). Physical therapy was going well, but Plaintiff continued to have difficulty lifting her left hip while seated and had some pain while sleeping. (R. 297). X-rays showed that the hip replacement hardware was in good position. (*Id.*) Dr. Wiley encouraged Plaintiff to exercise and to work on stretching and strength training. (*Id.*) At her 12-week post-op appointment, Plaintiff continued to do well in physical therapy and to have difficulty lifting her hip while seated. (R. 295). Otherwise, Plaintiff was healing well, and the hip replacement components remained in good position. (R. 295, 324).

The record also reflects treatment at Pavilion Family Medicine Center and Houston HealthCare med stops. (Exs. 5F, 17F, 20F). At a May 2019 visit, Plaintiff primarily complained of pain in her left wrist following a fall[1] and explained that she missed her last post-operative appointment with Dr. Wiley due to a lack of insurance. (R. 439). She stated that she completed physical therapy and was able to walk around her home without a cane. (*Id.*) She had also ignored her medication due to costs. (*Id.*) She reported some joint pain, but her gait was normal. (R 439, 440). Notes from the same visit, however, also describe her gait as weak and indicate that she used an unspecified ambulatory aid. (R. 441). Plaintiff had fractured her left hand and was instructed to follow-up with an orthopedic doctor. (R. 425, 427, 440). Plaintiff did not go to the orthopedist because of out-of-pocket costs. (R. 407).

At the June check-up, Plaintiff reported that she needed a cane to walk but had left it at home. (*Id.*) Plaintiff returned for several follow-up visits to monitor the hand fracture and her hypertension. (R. 400-404, 405, 406, 408). She received a referral to occupational therapy for her

---

[1] Duplicate records regarding Plaintiff's hand injury also appear in Exhibit 15F.

hand injury in October 2019. *See*, *e.g.*, (R. 428). Records of visits for complaints other than ortho-related pain do not make any mention of Plaintiff's pain levels, gait, or cane usage, including a visit in June 2020 when Plaintiff was transferred to the ER for an allergic reaction to medication. *See*, *e.g.*, (R. 636-640, 642-646, 653-657). At the ER, Plaintiff also disclosed no pain complaints or injuries. She was described as comfortable and in no apparent distress, and treatment notes do not describe her gait. (Ex. 9F). The physical examination of her lower extremities showed a normal range of motion. (R. 470).

Plaintiff received primary care treatment at the Houston County Volunteer Clinic and Warner Robins Medical Clinic. (Exs. 10F, 14F, 15F). After a December 2019 visit to the volunteer clinic, Plaintiff was referred to the Phoenix Center for treatment of depression.[2] (R. 562). Plaintiff stated at the March 2020 appointment that she had fallen about a month before after tripping over a vacuum cord. (R. 545). She stated that she hit her right shoulder and hip and had experienced constant, throbbing pain since the fall.[3] (*Id.*) Because of a change in Plaintiff's insured status, she was referred to Dr. Shekarrappa at Warner Robins Medical Clinic. (R. 546).

At June 2020 visits with the nurse practitioner at Dr. Skekarrappa's office, Plaintiff noted her recent ER visit and complained of bilateral hip pain. (R. 480, 474). During the physical exam, Plaintiff showed no joint swelling or tenderness. (R. 475, 481) Plaintiff also displayed good mood, judgment, and affect. (*Id.*) The nurse practitioner continued Plaintiff's prescriptions for Naproxen and Acetaminophen but also prescribed Tylenol with codeine until Plaintiff could follow-up with Dr. Wiley about her hip pain. (R. 481). Plaintiff was encouraged to engage in aerobic exercise 3-4 times per week. (R. 476).

---

[2] No records from the Phoenix Center appear in the record.
[3] This is the only mention of this fall in the record.

Plaintiff returned to Dr. Wiley in June and July 2020 with complaints of pain in both hips. (R. 487, 495). She rated the pain as a 6 out of 10 and described it as "constant, burning, dull and stabbing." (*Id.*) The pain interrupted her sleep, radiated, and made prolonged standing and walking difficult. (*Id.*) Her lumbar range of motion was limited due to pain, but she displayed good strength bilaterally, and straight leg tests were negative. (R. 488). Plaintiff's bilateral hip ranges of motion were nearly full despite "pain at the extremes," and her muscle strength was normal. (R. 488-489). In reference to the lumbar spine examination, the notes describe Plaintiff's gait as normal and observe that Plaintiff walked unassisted. (R. 488-489, 497). In reference to the hip examination, however, the notes indicate Plaintiff's gait was antalgic. (R. 489, 496-497). X-rays showed degenerative changes at T12-L1, L4-L5, and L5-S1, but hip x-rays showed no abnormalities and that the replacement components were in good position. (R. 490, 497-498). Plaintiff was referred to physical therapy. (R. 490, 498). Plaintiff started physical therapy in July 2020. (R. 627-629).

Plaintiff returned to Warner Robins Medical Clinic in August and September 2020. Plaintiff had no swelling or tenderness in her joints during the August physical exam. (R. 513). Notes indicate that Plaintiff was using a cane or walker, but she required no help with using a phone, transportation, shopping, laundry, preparing meals, housework, or managing money or medications. (R. 513). Plaintiff's depression screening was positive for severe depression. (R. 514). At the September 2020 visit, Plaintiff's pain medications remained unchanged, but she received a prescription for Cymbalta after she reported seeing no results on Lexapro. (R. 506-508)

In September 2020, at an appointment with Dr. Wiley, Plaintiff reported that her pain remained at a 6 to 7 on a 10 scale, and she confirmed attending physical therapy. (R. 631). Plaintiff continued to have back pain and used a cane. (R. 631-632). Her ranges of motion and gait were the same as at the June and July 2020 appointments. (R. 632-633). Dr. Wiley referred Plaintiff for

an MRI of her lumbar spine after the physical exam showed some tenderness. (R. 632, 634). He encouraged Plaintiff to exercise, including strength training and stretching. (*Id*.) The MRI revealed post-surgical changes at L5-S1, tiny disc bulges at T-10 through T-12, and multilevel degenerative changes with the greatest severity at L5-S1. (R. 624-626). There was no significant canal stenosis. (R. 622). In November 2020, Plaintiff received a steroid injection in her right hip, but the relief she received lasted only two days. (R. 613, 630). Plaintiff's pain rating remained unchanged in December 2020. (R. 613).

In February 2021, the last appointment with Dr. Wiley in the record, Plaintiff's pain rating increased to 8 to 9 out of 10. (R. 671). Plaintiff stated that she used a cane to get around. (*Id*.) The physical examination of Plaintiff's hips yielded the same results as at past visits, but Plaintiff showed a "functional range of motion for lumbar flexion, extension, axial, rotation, and left and right lateral bend." (R. 673). The treatment plan included scheduling a possible revision of her right hip replacement after a bone scan revealed a proximal shift of the right femur. (R. 675, 686, 696). Four days after the appointment with Dr. Wiley, on February 5, 2021, Plaintiff visited the Houston HealthCare Med Stop, reporting that Tramadol did not control her pain. (R. 690). Plaintiff stated that the pain was radiating from her right hip and had been that way for months. (*Id*.) She was using a cane. (R. 692). Plaintiff received Toradol for pain and was discharged. (R. 693).

The record also includes treatment records from Houston Behavioral Health Associates, (Ex 18F) and All Care Medical Associates (Ex. 22F), with service dates after Plaintiff's date last insured. Plaintiff first visited Houston Behavioral Health Associates in January 2021. (R. 664). Notes reflect a history of chronic pain, which she dated to 2017 following her first hip replacement. (*Id*.) Plaintiff stated that the pain had diminished her quality of life and her activities of daily living. (*Id*.) Plaintiff described some positive effects after taking Cymbalta. (*Id*.) At the visit, Plaintiff was

walking with a cane, displayed frustrated but cooperative behavior, and showed normal muscle strength and tone during the physical examination. (R. 666). Treatment providers related Plaintiff's worsening mood and anxiety to her chronic pain. (*Id*.) The record does not reflect that Plaintiff returned for treatment.

Plaintiff treated at All Care Medical in March and May 2021, where she complained of leg pain, pinching back pain, and right knee pain and numbness. (R. 716, 718). Plaintiff also wanted a second opinion regarding the bone scan that showed revision surgery was necessary. (*Id.)*. Plaintiff's gait was within normal limits. (R. 717, 719). Plaintiff was observed to rub her right knee throughout the appointments. (*Id*.) X-rays showed no fracture or dislocation, but they did show joint space narrowing and bone demineralization. (R. 714, 725). She was referred to OrthoGeorgia. (R.717, 719).

Plaintiff had several consultative exams as part of her application process. Plaintiff saw Dr. Danielle Berry for a consultative physical exam in May 2019. (Ex. 3F). Plaintiff did not disclose taking any medications at the time of the exam. (R. 389). Plaintiff discussed having had pain in her shoulders, elbows, wrists, hands, hips, ankles, feet, neck, and back, but explained that her hips presented the greatest pain issues. (R. 389-390). Plaintiff avoided rating whether the pain was worse before or after her surgeries and focused on how the pain impacted her present abilities. (R. 390). Plaintiff explained that she has a walker at home and uses a cane when she goes out. (*Id*.) She also disclosed a recent fall affecting her left hand and knee and described her past hip replacements. (R. 390, 392). Plaintiff was not undergoing any present treatment or physical therapy. (R. 390).

Plaintiff limited her ability to climb stairs, walk more than short distances, perform household chores, stand, and lift. (R. 390-391). Plaintiff described being able to feed and dress

herself, write, and manage her finances. (*Id*.) Plaintiff used a cane, but she had no difficulty getting up from a chair or the exam table. (R. 392). Although Plaintiff asserted she was unable to climb more than t 2 or 3 steps, Dr. Berry observed that Plaintiff had to traverse at least 3 steps and a curb to enter and exit the clinic. (R. 391). Dr. Berry observed the cane to be helpful when Plaintiff walked but opined that it was not medically required because Plaintiff changed the legs she favored, used the cane more for balance, and sometimes carried the cane instead of using it. (R. 392). Plaintiff displayed no acute distress, but she became tearful during intake and when she anticipated pain during the exam. (R. 391). For example, Plaintiff refused to attempt the supine straight leg raise due to fears of pain and falling. (R. 392). Dr. Berry performed some range of motion testing with Plaintiff seated, which showed pain in Plaintiff's hips. (*Id*.) However, all ranges of motion appeared normal. (R. 393). Plaintiff's recent left hand injury impacted and limited portions of the exam. (*Id*.)

In January 2020, Plaintiff saw Dr. Stanford Williamson for a physical consultative exam. (Ex. 8F). Plaintiff disclosed her previous hip surgeries and the pain she experienced. (R. 458). At the examination, Plaintiff used a cane, but Dr. Williamson noted that she was able to walk without it even though there were abnormalities in her gait. (R. 458, 462). Dr. Williamson described Plaintiff's hip range of motion to be "within functional limits for independent transfers and gait." (R. 459). Plaintiff could not perform tests requiring standing on her heels or toes without holding on to the exam table, and she expressed apprehension in completing them due to her hip pain. (*Id*.) A December 2019 x-ray in conjunction with the exam showed no loosening of the hardware associated with Plaintiff's hip replacements. (R. 446). Dr. Williamson opined that Plaintiff would have unspecified limitations with prolonged standing, sitting, walking, lifting, carrying, and handling. (R. 459).

Dr. Donald Meck conducted a psychological consultative exam in August 2020. (Ex. 13F). Plaintiff reported living alone, but her granddaughter drove and accompanied her to the appointment. (R. 500). Plaintiff explained that she had last worked in November 2018 after her left hip surgery, denied any prior mental health treatment, and listed her current medications as methylpred, codeine, spironolactone, amlodipine, Simvastatin, Hydralazine, metoprolol tart, and levothyroxine. (*Id.*) Plaintiff described constantly hurting every day, which caused issues with sitting, walking, standing, and sleeping. (*Id.*) Plaintiff's granddaughter described Plaintiff as depressed because of hip pain, and Plaintiff referenced being tired of the pain several times during the examination. (R. 500, 502). Dr. Meck described Plaintiff's gait as unsteady and noted that Plaintiff used a cane. (R. 501). Dr. Meck found that Plaintiff can cook meals, manage her finances, and maintain her apartment, although a neighbor helps take out her trash. (*Id.*) He found Plaintiff's mood "marked by mild depression" and assessed her with "adjustment disorder with depressed mood secondary to medical issues." (R. 502). Dr. Meck opined that none of Plaintiff's psychological issues significantly restricted her functional abilities. (*Id.*)

Plaintiff also completed function reports and testified at the hearing before the ALJ. Plaintiff first completed an exertional activity questionnaire in March 2019. (Ex. 5E). Plaintiff lived alone in an apartment, explained that she experienced pain, fatigue, nausea, and shortness of breath, and always used a cane or walker after her hip replacements. (R. 244). She disclosed trying to complete exercises she has been told to do and fixing meals, but she had to use her walker or cane during those activities. (*Id.*) Plaintiff limited her ability to walk because she needed to rest after minimal activity such as walking to her kitchen or taking out her trash. (R. 244, 246). She could only do chores or housework in five-minute increments due to pain. (R. 246). Her constant pain kept her from sleeping through the night. (R. 246). She denied ever climbing stairs or cleaning

the house other than doing dishes. (R. 245-246). Plaintiff rarely shopped, but when she does go with her daughter, she uses a riding cart. (R. 245). She listed her medications as baclofen, gabapentin, oxycodone, and Tylenol arthritis. (R. 246).

Plaintiff completed a function report in December 2019. (Ex. 8E). She described similar activity levels and limitations to those described in her exertional activity questionnaire. (R. 258-264). In the function report, Plaintiff described her pain as tingling and burning in both legs from her hips to her knees, and she stated that she was unable to sit or stand for long periods of time. (R. 258). She also stated that she had difficulty dressing herself and only takes showers. (*Id*.) Plaintiff listed her daily activities as watching TV, doing word searches, and reading. (R. 262). Plaintiff stated that she would need to use her cane or walker to get up if she had been seated too long. (*Id*.) She sometimes needed someone to accompany her when going out to places like church, the store, or a friend's house. (*Id*.) Plaintiff limited her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, and complete tasks. (R. 263). She stated that her ability to lift was limited to 15 pounds and suggested that she could walk no more than 20 yards, on a good day, before needing to rest. (*Id*.)

In her testimony before the ALJ, Plaintiff described being in constant pain and being unable to walk without her cane or walker since having her hips replaced. (R. 53, 60). She continued to limit her ability to sit or stand and further suggested that she would need to rest or change positions every 5 minutes. (R. 54-55, 57). She denied being able to have a sedentary job because of that limitation. (R. 56). Plaintiff discussed returning to work after her first surgery, but she denied ever receiving any benefit or relief following her hip replacements. (R. 56-57). At the hearing, she was still having trouble sleeping and associated her pain with her right hip issues and stated that her left hip was doing okay. (R. 59, 63). She stated that she was still able to fix simple meals and

shower with the use of a shower chair, but she denied cleaning or doing other major housework. (R. 61). Plaintiff further denied receiving any relief or benefits from her medication. (R. 57).

## DISABILITY EVALUATION

Following the five-step sequential evaluation process, the reviewing ALJ made the following findings in this case. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since November 13, 2018, the alleged onset date. (R. 18). Plaintiff's date last insured was September 30, 2020. (R. 17). At step two, the ALJ found that Plaintiff suffered from the following severe impairments: essential hypertension; residuals bilateral hip replacements and osteoarthritis of the right knee; degenerative disc disease of the spine with radiculopathy; residuals left hemilaminectomy at L5-S1; bilateral hip trochanteric bursitis; bilateral sacroiliitis; and asthma. (R. 18). She also found that Plaintiff suffered from residuals of cataract surgery and carpal tunnel syndrome; left wrist fracture; left knee distal femur enchondroma; echogenic bilateral renal cortex; medical renal disease; right benign simple renal cortical cysts; diverticulitis; depressive disorder; adjustment disorder with depressed mood secondary to medical issues; hyperlipidemia; and hypothyroidism, but the ALJ found that these impairments were non-severe or not medically determinable. (*Id.*) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments meeting or medically equaling the severity of one of the listed impairments. (R. 19-21). Therefore, the ALJ assessed Plaintiff's RFC and determined that Plaintiff could perform sedentary work as defined by 20 C.F.R. § 404.1567(a), with the following limitations:

> [The] claimant requires the use of a cane to ambulate to and from the workstation; can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; can never climb ladders, ropes, or scaffolds; frequent exposure to workplace hazards, such as open machinery and unprotected heights; and occasional exposure

to pulmonary irritants such as odors, dusts, gases, fumes, and poorly ventilated areas.

(R. 21).

Based on this RFC, the ALJ found at step four that Plaintiff, as of her DLI, was capable of performing her past relevant work as a claims clerk I. (R. 28-29). Therefore, the ALJ did not make any determinations at step five. *See* (*id*.) As a result, the ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act at any time from November 13, 2018, through the DLI, September 30, 2020. (R. 29).

## ANALYSIS

Plaintiff argues that the ALJ improperly applied the pain standard to Plaintiff's subjective pain complaints. (Doc. 10). As discussed below, the ALJ appropriately considered the pain standard and explained her findings and conclusions based on the entire record. The decision is supported by substantial evidence.

<u>The Pain Standard</u>

When a claimant asserts disability through testimony of pain or other subjective symptoms, the Eleventh Circuit "requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can reasonably be expected to give rise to the alleged pain." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (citing *Landry v. Heckler*, 782 F.2d 1551, 1553 (11th Cir. 1986)). If the objective medical evidence does not confirm the severity of the alleged symptoms, but indicates the claimant's impairment could reasonably be expected to produce some degree of pain and other symptoms, the ALJ evaluates the intensity and persistence of the claimant's symptoms and their effect on her ability to work by considering the objective medical evidence, the claimant's daily

13

activities, treatment and medications received, and other factors concerning functional limitations and restrictions due to pain. *See* 20 C.F.R. § 404.1529. "If the ALJ discredits subjective testimony, he must articulate explicit and adequate reasons for doing so." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987)). As Plaintiff correctly notes, "a claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability." *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995) (citing *Holt*, 921 F.2d at 1223).

1. <u>The ALJ correctly identified and applied the pain standard to Plaintiff's subjective symptoms.</u>

The ALJ correctly recognized that the pain standard should be applied to Plaintiff's case. (R. 21-22). The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence, and limiting effect of these symptoms are not entirely consistent with the medical evidence and other evidence in the record…." (R. 22). By reaching this step in the analysis, as the Plaintiff concedes (Doc. 10, p. 16), the ALJ found Plaintiff to have conditions which could produce her alleged pain and symptoms. Therefore, Plaintiff's challenge rests in whether the ALJ adequately explained her reasons to discredit Plaintiff's subjective symptoms of pain and if those conclusions are supported by the entire record.

Plaintiff argues that the medical record supports her subjective symptoms and meets the pain standard and that the ALJ failed to correctly evaluate the record. (*Id*., p. 15-19). Plaintiff cites her complaints of pains to several treatment providers, her diagnosis for depression stemming from her pain symptoms, and the February 2021 bone scan showing that she required revision surgery as support for her claim of debilitating hip pain, (*Id*.) Contrary to Plaintiff's suggestion, the ALJ did not ignore Plaintiff's treatment, subjective symptoms of pain, and alleged limitations. The ALJ

accurately summarized Plaintiff's treatment record, her testimony and the other portions of the record reflecting Plaintiff's alleged limitations.[4]

The ALJ recounted Plaintiff's function report, exertional questionnaire, and the substantial limitations that she described such as her need of a cane and limitations in areas such as housework, lifting, sitting, and walking, caused by chronic pain. (R. 22). The ALJ found Plaintiff's hearing testimony to be consistent with her prior reports. (*Id.*) The decision then describes Plaintiff's surgical history and her recovery from both hip surgeries but also notes that Plaintiff continued to work until the left hip surgery in 2018. (R. 22-23). The ALJ recognized that Plaintiff reported significant pain to Dr. Berry and Dr. Williamson at the consultative examinations in May 2019 and January 2020, respectively. (R. 23-24). The ALJ also noted the examiners' findings in their physical examinations and observations about Plaintiff's gait and cane usage. (R. 23-24). The decision correctly summarized Plaintiff's complaints of pain to the nurse practitioner at Warner Robins Medical Clinic and Dr. Wiley in the summer and fall of 2020. (R. 24). The ALJ then recognized Plaintiff's mental health treatment and Dr. Meck's consultation exam. (R. 25-26).

This summary demonstrated that Plaintiff did not ignore Plaintiff's complaints of pain. Instead, the ALJ considered Plaintiff's complaints of pain in terms of the entire record. The ALJ compared Plaintiff's daily activities and description of symptoms to her subjective symptoms and treatment and then explained how the record supported the ultimate RFC and decision that Plaintiff was not disabled through the DLI. For example, Plaintiff claimed throughout the record that she had required a cane or walker since her hip surgeries. Even though no doctor prescribed one, and Plaintiff sometimes forgot her cane or did not use it consistently, the ALJ included accommodations for cane usage in the sedentary RFC. (R. 21). The ALJ also recognized that

---

[4] The ALJ also reviewed Plaintiff's late 2020 and early 2021 treatment records even though Plaintiff's DLI was September 30, 2020. (R. 25).

Plaintiff complained of pain symptoms and sleeping issues at multiple medical visits, but the ALJ rightly noted that often examinations showed normal muscle strength, normal gait, and no joint swelling or tenderness. (R. 24). The records from Plaintiff's June 2020 ER visit for an allergic reaction do not mention Plaintiff's hip pain or describe her gait, and Plaintiff showed normal ranges of motion. (R. 466- 473). As late as July 2020, approximately 3 months before the DLI, Plaintiff showed full range of motion in her hips. (R. 488-489). X-rays of both hips also showed the replacement hardware was in good position. (R. 24, 498). Plaintiff's August 2020 Medicare screening revealed a normal musculoskeletal exam and noted that Plaintiff needed no help with multiple daily activities. (*Id*.) This 2020 exam is contrasted against Plaintiff's function report and questionnaire from 2019, in which Plaintiff severely limited herself in several areas despite cooking, caring for herself, and doing other work around her apartment while living alone. Plaintiff's subjective reports of pain suggest constant pain in both hips since her surgeries, but after her right hip surgery and before Plaintiff's left hip replacement, records show that she did not complain about her right hip. S*ee* (Ex. 1F). As late as at the administrative hearing, Plaintiff stated that her left hip was doing okay. (R. 63).

The ALJ ultimately found that Plaintiff's subjective symptoms were not consistent with the objective medical record or with Plaintiff's reported activities of daily living, "which suggest greater sustained capacity than alleged by Plaintiff." (R. 28). The ALJ did not misstate any portion of the record. The ALJ clearly articulated an analysis of the objective treatment record sufficient to establish substantial evidence in support of the decision and to discount Plaintiff's subjective statements of severity. *See Brown v. Comm'r of Soc. Sec.*, 677 F. App'x 529, 531-532 (11th Cir. 2017). There is no basis for remanding or reversing Plaintiff's case.

## CONCLUSION

Based on the foregoing, it is **ORDERED** that the Commissioner's decision be **AFFIRMED**.

**SO ORDERED**, this 12th day of September, 2023.

s/ Charles H. Weigle
Charles H. Weigle
United States Magistrate Judge
